IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VERNON SHAW, III,

          Petitioner,               No. CIV S-06-0466 LKK CHS P

      vs.

R. J. KIRKLAND,

          Respondent.           <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I.      <u>INTRODUCTION</u>

         Petitioner Vernon Shaw, is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner attacks his conviction in the San Joaquin County Superior Court, case number SF082211A, for two counts of attempted murder, three counts of assault with a semiautomatic firearm, and three counts of discharging a firearm from a vehicle.

II.     <u>CLAIMS</u>

         Petitioner argues that:

        A.      The trial court erred by imposing consecutive sentences;

        B.      The trial court erred by refusing a specifically requested jury instruction

1

on accomplice testimony;

C.     In-court identifications should not have been allowed; and

D.     He received ineffective assistance of trial and appellate counsel.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's petition for habeas corpus relief be denied.

III.    FACTUAL AND PROCEDURAL BACKGROUND

    A.    Facts[1]

Robert Horn worked and lived about a block from Poplar Street, in Stockton. He had recently acquired a burgundy-colored Cutlass and on April 28, 2001, someone broke his car window and stole his stereo.

On May 2, 2001, Sean Abrams, an acquaintance of Horn's, appeared and told Horn he had seen a guy named "Fooka" break into Horn's car and steal the stereo. He also told Horn he knew where Fooka lived. The two men drove three houses down and parked on the corner of Poplar Street, where they saw Zakarias Brown and another male. Abrams identified Zakarias, aka "Fooka," as the thief. Horn had seen Zakarias in the neighborhood, so he got out of his car and approached him, telling Zakarias that he (Horn) had heard that Zakarias had stolen his car stereo. Zakarias denied stealing the stereo and the two discussed the matter. Horn believed him and concluded that Abrams had lied to him, so he told Zakarias to forget the matter, they shook hands, and Horn turned and began walking back to his car.

As Horn walked away, Zakarias said, "If you want trouble, I give him trouble." Horn then saw Abrams charge towards Zakarias, while pushing up his sleeves. Zakarias pulled out a handgun and shot Abrams in the neck, and as Abrams turned to run, Zakarias shot him again in the back. Horn thought Zakarias was shooting at Abrams.

Abrams screamed he was hit, jumped into Horn's car, and Horn drove him to Dameron Hospital. During that drive, Abrams asked Horn to go back and retrieve his cell phone, which he had dropped when he was shot. Horn told him not to worry.

---

[1] This statement of facts is taken from the September 15, 2004 opinion by the California Court of Appeal for the Third Appellate District, case number C043228 (hereinafter Opinion), lodged with respondent's answer as Lodged Document 7. These facts have not been rebutted with clear and convincing evidence and must, therefore, be presumed correct. 28 U.S.C. § 2254(e)(1); Taylor v. Maddox, 336 F.3d 992, 1000 (9th Cir.2004).

2

Horn spoke to police officers at the hospital and agreed to go back to the scene and try and identify the shooter.  He was transported in a patrol car to the scene of the shooting where he identified Zakarias and Zakarias was arrested.  About 30 minutes later, the police returned Horn to the hospital.  Meanwhile, Abram's family had arrived at the hospital, including defendant [petitioner Shaw, who is Sean Abram's brother].  Abram's mother asked Horn if he knew where Abrams dropped his cell phone and he told her he did.  Shortly afterwards, defendant asked Horn if he would take him to the area where Abrams had dropped his cell phone and Horn agreed.

Meanwhile, people had begun gathering in front of the apartment complex where Abrams was shot.  Two of Zakarias's brothers, Darwin Brown and Clayton Brown, were standing in the driveway in front of the apartment complex, talking about Zakarias's arrest.  Their longtime friend David Brown III and his one-year old son, David Brown Jr., came by and saw Zakarias seated in the back of a police car and Horn seated in another police car talking on a cell phone.  Darwin told David that Horn was responsible for Zakarias's arrest.  A short time later, Calvin Davis, Maurice Crawford, and Carnell Burse stopped to talk to the Brown brothers.

Meanwhile, Horn and defendant were headed back to Poplar Street in Horn's Cutlass, ostensibly to retrieve Abram's cell phone.  During the drive, defendant asked Horn about Zakarias and Horn told him the police had taken him to jail.  When they reached Poplar Street, Darwin spotted the Cutlass as it slowly approached them and said "[h]ere come those fools now."  He and Clayton thought there was going to be trouble as a result of the Abram's shooting.  The rest of the men in their group stood up to see the car and as it approached the group, Darwin stated walking towards it.  Just as he reached the sidewalk, the car stopped and defendant began shooting a semiautomatic handgun from the passenger window.

Darwin and Clayton were hit and fell to the ground.  Calvin was also hit in the face but was able to run up the stairs for help.  Upon hearing the first shot, David grabbed his son and hit the ground, while Maurice jumped over a gated fence, and Carnell followed by breaking though it.

Darwin Brown was hit twice in the head and once in the leg and lay on the ground unconscious.  He regained consciousness in the hospital where he remained for a month.  Bullet fragments remain lodged in his head.  Clayton Brown was shot four times, twice in the buttocks, once in the leg, and once in the thigh.  One of the bullets exited through his penis.  Calvin Davis was shot in the face and lost his eye.

Immediately after the shooting, defendant pointed the gun at Horn

3

and ordered him to drive away.  Horn complied, but as he was driving, he heard a clicking sound.  Thinking defendant was reloading his gun, he looked at defendant, which caused him to hit another car.  Defendant exited the car and fled on foot.  Horn drove to the Greyhound bus station, caught a bus to Mississippi, and stayed there for one day.  He then went to Milwaukee, where he stayed for about a month until he was arrested.

An anonymous tip led Stockton Police officials to Buffalo, New York where defendant was apprehended after he attempted to flee from 12 to 15 Buffalo police officers who pursued him in a foot chase through numerous fenced in yards.  He was subsequently extradited to California.

**Defense**

Defendant took the stand and testified in his own behalf.  He denied being in Horn's car on May 2, 2001, or shooting the victims, and pointed the finger at Horn.  He testified that after he learned his brother had been shot, he went to the hospital where he found out what happened.  He spoke to Horn at the hospital about the shooting and Horn told him he had just come from the scene of the shooting where he identified the shooter, although he did not identify the shooter by name.  Defendant left the hospital by himself and went home where he told his girlfriend what happened, then he went to his uncle's house and then to his aunt's house.  The following day, Sean told him about the shooting of the Brown brothers and their friends.  Later, he heard that people in the neighborhood were looking for him and felt he and his family were in danger, so he decided to take his family and leave Stockton.  He went to Los Angeles first and then to Buffalo, New York where his cousin lived.

Defendant also called several witnesses who testified.  According to his aunt, Ocee Deed, she met Horn a couple of days before the shooting when he was driving his Cutlass.  At that time, he said only thing wrong with his car was that "Darfus and them," who lived around the corner from him, had stolen his stereo and that he was going to get them niggers for that.  When she told him he could always get a new stereo, he said, "No. No. I'm going to get them niggers."

Sean Abrams testified that on May 2, 2001, Horn called him on his cell phone and told him he had seen the people who stole his stereo and he wanted to go jump them.  He picked up Abrams and they drove around the corner where Horn approached Fooka and an argument ensued.  Sean was standing by Horn's car when Horn started to run towards him, and Fooka started shooting.  Abrams was sure Fooka was shooting at Horn, although Abrams was the one that got hit, once in the neck and then as he ran away, again in the back.  On the drive to the hospital, Horn told Abrams he was

4

1          going back to take care of business.  Abrams did not see his
           brother at the hospital.

2   /////

3   Opinion at 3-8.

4          After petitioner's first trial the jury was unable to reach a verdict.  Reporter's

5   Transcripts ("RT") at 43.  After a second trial petitioner was found guilty on December 5, 2002,

6   of two counts of attempted murder, three counts of assault with a semiautomatic firearm, and

7   three counts of discharging a firearm from a vehicle, with all firearm enhancements found to be

8   true.  Answer, Lodged Doc 14 at 418-419.  The trial judge sentenced petitioner to an aggregate

9   term of ninety-eight years to life on January 27, 2003.  Id. at 671-77, 683-85.

10         B.     Procedural History

11                1)     State Appellate Review

12         Petitioner filed his appellate brief in the California Court of Appeal, Third

13  Appellate District on February 19, 2004.  Answer, Lodged Doc. 3 at 2.  That court denied his

14  appeal in a reasoned opinion on September 15, 2004.  Answer, Lodged Doc. 7.  On October 26,

15  2004, petitioner filed a petition for review in the California Supreme Court.  Answer, Lodged

16  Doc. 9.  That petition was summarily denied on December 12, 2004.  Answer, Lodged Doc. 10.

17                2)     Habeas Review

18         Petitioner filed a petition for a writ of habeas corpus in the California Supreme

19  Court on January 19, 2006.  Answer, Lodged Doc. 11.  That petition was denied on October 18,

20  2006.  Petitioner then filed his original petition for a writ of habeas corpus in this matter on

21  January 31, 2006.  On February 16, 2007, petitioner filed his first amended petition.

22  IV.    APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

23         An application for a writ of habeas corpus by a person in custody under a

24  judgment of a state court can be granted only for violations of the Constitution or laws of the

25  United States.  28 U.S.C. § 2254(a).

26  /////

1    Federal habeas corpus relief is not available for any claim decided on the merits

2 in state court proceedings unless the state court's adjudication of the claim:

3    (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established federal law, as
4    determined by the Supreme Court of the United States; or

5    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
6    State court proceeding.

7   28 U.S.C. § 2254(d).

8    Although "AEDPA does not require a federal habeas court to adopt any one

9 methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which

10 guide its application.

11    First, the "contrary to" and "unreasonable application" clauses are different.  As

12 the Supreme Court has explained:

13    A federal habeas court may issue the writ under the "contrary to"
     clause if the state court applies a rule different from the governing
14    law set forth in our cases, or if it decides a case differently than we
     have done on a set of materially indistinguishable facts.  The court
15    may grant relief under the "unreasonable application" clause if the
     state court correctly identifies the governing legal principle from
16    our decisions but unreasonably applies it to the facts of the
     particular case.  The focus of the latter inquiry is on whether the
17    state court's application of clearly established federal law is
     objectively unreasonable, and we stressed in Williams [v. Taylor,
18    529 U.S. 362 2000)] that an unreasonable application is different
     from an incorrect one.

19 /////

20 Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state

21 court's decision was either contrary to or an unreasonable application of federal law.  Woodford

22 v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court

23 decisions to determine what law has been "clearly established" by the Supreme Court and the

24 reasonableness of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597,

25 598 (9th Cir. 2000).

26 /////

6

Second, the court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  So long as the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).

Third, in determining whether a state court decision is entitled to deference, it is not necessary for the state court to cite or even be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer,  537  U.S. 3, 8 (2003).  Moreover, a state court opinion need not contain "a formulary statement" of federal law, so long as the fair import of its conclusion is consonant with federal law.  Id.

V.      DISCUSSION OF PETITIONER'S CLAIMS

    A.      Consecutive Sentences

        1)      Description of Claim

In determining petitioner's sentence the trial judge imposed a number of consecutive terms.  RT at 921-25.  Petitioner argues that the imposition of consecutive terms requires a separate finding of fact by the jury in addition to the verdict.  Petition at 9.

        2)      State Court Opinion

The California Court of Appeal rejected this claim stating:

> Section 669 grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes.  (§ 1170.1, subd. (a); In re Hoddinott (1996) 12 Cal.4th 992, 1000;  People v. Scott (1994) 9 Cal.4th 331, 349; People v. Neal (1993) 19 Cal.App.4th 1114, 1117.)  The sentencing rules specify several criteria to guide the trial court's determination whether to impose consecutive or concurrent terms.  Pertinent to this case is the fact the "crimes involved separate acts of violence...."  (Cal. Rules of Court, rule 4.425(a)(2) (hereafter rule).)  FN.  Under this criterion, the court may impose consecutive sentences for separate acts of violence against multiple victims.  (People v. Champion (1995) 9 Cal.4th 879, 934; People v. Thurs (1986) 176 Cal.App.3d 448, 452-453.)
>
> FN Rule 4.425 provides in full as follows: "Criteria

7

affecting the decision to impose consecutive rather than
concurrent sentences include:

(a) Facts relating to the crimes, including whether or not:

(1) The crimes and their objectives were predominantly
independent of each other.

(2) The crimes involved separate acts of violence or threats
of violence.

(3) The crimes were committed at different times or
separate places, rather than being committed so closely in
time and place as to indicate a single period of aberrant
behavior.

(b) Any circumstances in aggravation or mitigation may be
considered in deciding whether to impose consecutive
rather than concurrent sentences, except (i) a fact used to
impose the upper term, (ii) a fact used to otherwise enhance
the defendant's prison sentence, and (iii) a fact that is an
element of the crime shall not be used to impose
consecutive sentences."

Operating in tandem under similar criteria but in reverse fashion
from rule 4.425, section 654, subdivision (a) prohibits multiple
punishment for a single act or indivisible course of conduct that is
punishable under more than one criminal statute.  FN.  "Whether a
course of criminal conduct is divisible and therefore gives rise to
more than one act within the meaning of section 654 depends on
the intent and objective of the actor.  If all of the offenses were
incident to one objective, the defendant may be punished for any
one of such offenses but not for more than one."  (Neal v. State of
California (1960) 55 Cal.2d 11, 19;  People v. Perez (1979) 23
Cal.3d 545, 551.)  However, this prohibition against multiple
punishment is inapplicable " 'where ... one act has two results each
of which is an act of violence against the person of a separate
individual.' "  (Neal v. State of California, supra, 55 Cal.2d at pp.
20-21, quoting People v. Brannon (1924) 70 Cal.App. 225, 235-
236; People v. Deloza (1998) 18 Cal.4th 585, 592.)

FN. Section 654, subdivision (a) provides in pertinent part:
"An act or omission that is punishable in different ways by
different provisions of law shall be punished under the
provision that provides for the longest potential term of
imprisonment, but in no case shall the act or omission be
punished under more than one provision."

Thus, the court may impose consecutive terms of imprisonment
where the criminal act is an act of violence against separate
individuals and rule 4.425 and section 654 does not prohibit
multiple punishment under that circumstance.  That is the

operative circumstance in this case.  The court imposed consecutive sentences on counts one (Darwin Brown), two (Clayton Brown), four (David Brown III), five (David Brown, Jr.), seven (Carnell Burse), and ten (Calvin Davis) because they involved acts of violence against separate victims, and stayed the sentences on counts eight and nine because those two counts involved the same victims (Darwin and Clayton) and the same operative facts as did counts one and two.

Nor was the court's decision to impose consecutive terms of imprisonment barred by <u>Apprendi</u> or <u>Blakely</u> because the fact supporting its decision was found by the jury. The information charged separate assaults for each victim and each verdict returned by the jury found that defendant committed an assault against a different named individual.  Therefore, because imposition of consecutive sentences on counts one, two, four, seven, and ten was based upon the jury's verdicts rather than the court's independent findings of fact, defendant's sentence does not run afoul of <u>Apprendi</u> and <u>Blakely</u>. We therefore reject his claim of error.

Opinion at 20-22.

3)      <u>Applicable Law and Discussion</u>

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  In <u>Blakely v. Washington</u>, 542 U.S. 296, 303-04 (2004) the Supreme Court held that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."

In California, "[i]n deciding whether to impose consecutive terms, the trial court may consider aggravating and mitigating factors, but there is no requirement that, in order to justify the imposition of consecutive terms, the trial court find that an aggravating circumstance exists.  Factual findings are not required."  <u>People v. Black</u>, 41 Cal.4th 799, 822 (Cal. 2007) (<u>"Black II"</u>) (<u>citing</u> Cal. Penal Code § 669 and Cal. R. Ct. 4.425(a), (b)).  Under this statutory scheme, the California Supreme Court has held that "imposition of consecutive terms under California Penal Code section 669 does not implicate a defendant's Sixth Amendment rights."  <u>Id</u>. at 821 (reaffirming earlier holding in <u>Black I</u>, after <u>Cunningham v. California</u>, 549 U.S. 270

9

1  (2007) ("Cunningham ... does not undermine our previous conclusion that imposition of

2  consecutive terms under section 669 does not implicate a defendant's Sixth Amendment rights.").

3          The United States Supreme Court recently answered in the negative the question

4  whether the Sixth Amendment, as construed in Apprendi, and Blakely, requires that facts

5  necessary to impose consecutive sentences be found by the jury or admitted by the defendant.

6  Oregon v. Ice, --- U.S. ----, 129 S.Ct. 711 (2009) (upholding an Oregon statute that assigned to

7  judges, rather than juries, the findings of fact necessary to impose consecutive, rather than

8  concurrent, sentences for multiple offenses). Id. at 719.

9          The state court's rejection of this claim was neither contrary to, nor an

10  unreasonable application of, clearly established federal law and petitioner is not entitled to relief

11  on this claim.

12          B.      Jury Instruction Error

13                  1)      Description of Claim

14          Petitioner argues that the trial court erred by denying a defense request to issue a

15  specific jury instruction regarding accomplice testimony.  Petition at 13.  The trial court instead

16  issued a pattern jury instruction, CALJIC No. 318, as well as additional instructions concerning

17  accomplice testimony.  RT at 828-30.

18                  2)      State Court Opinion

19          The California Court of Appeal rejected this claim stating:

20      The instruction requested by defendant was proposed by Justice
        Kennard in her concurring opinion in Guiuan.  It advises the jury
21      on the reasons why accomplice testimony should be viewed with
        greater care and caution and directs the jury "to view with distrust
22      accomplice testimony that supports the prosecution's case."  (18
        Cal.4th at 576.)  FN.  Because concurring opinions are not binding
23      (Rosato v. Superior Court (1975) 51 Cal.App.3d 190, 211; People
        v. Amadio, (1971) 22 Cal.App.3d 7, 14), the trial court properly
24      refused to give this instruction.

25          FN.  The proposed instruction states: "In deciding whether
            to believe testimony given by an accomplice, you should
26          use greater care and caution than you do when deciding

10

1        whether to believe testimony given by an ordinary witness.

Because an accomplice is also subject to prosecution for
the same offense, an accomplice's testimony may be
strongly influenced by the hope or expectation that the
prosecution will reward testimony that supports the
prosecution's case by granting the accomplice immunity or
leniency. For this reason, you should view with distrust
accomplice testimony that supports the prosecution's case.
Whether or not the accomplice testimony supports the
prosecution's case, you should bear in mind the
accomplice's interest in minimizing the seriousness of the
crime and the significance of the accomplice's own role in
its commission, the fact that the accomplice's participation
in the crime may show the accomplice to be an
untrustworthy person, and an accomplice's particular
ability, because of inside knowledge about the details of the
crime, to construct plausible falsehoods about it. In giving
you this warning about accomplice testimony, I do not
mean to suggest that you must or should disbelieve the
accomplice testimony that you heard at this trial. Rather,
you should give the accomplice testimony whatever weight
you decide it deserves after considering all the evidence in
the case." (18 Cal.4th at p. 576.)

Instead, the trial court gave the instruction (CALJIC No. 318)
proposed by the majority in <u>Guiuan</u>, FN. Moreover, the jury was
also instructed that Horn was an accomplice as a matter of law and
properly given the corresponding full array of pattern instructions
for evaluating accomplice testimony, including the definition of an
accomplice (CALJIC No. 3.10), the requirement that accomplice
testimony be corroborated (CALJIC No. 3.11), the nature and
sufficiency of corroborative evidence (CALJIC No. 3.12), the
necessity of criminal intent (CALJIC No. 3.14) , and the
requirement that accomplice testimony be viewed with caution.
(CALJIC No. 3.18). (<u>People v. Noguera</u> (1992) 4 Cal.4th 599,
630-31.) We therefore conclude the jury was properly instructed
on accomplice testimony and that the trial court did not err in
refusing to give the requested special instruction.

        FN. The court in <u>Guiuan</u> directed that "the jury should be
instructed to the following effect whenever an accomplice,
or a witness who might be determined by the jury to be an
accmoplice, testifies: 'To the extent an accomplice gives
testimony that tends to incriminate the defendant, it should
be viewed with caution. This does not mean, however, that
you may arbitrarily disregard that testimony. You should
give that testimony the weight you think it deserves after
examining it with care and caution and in light of all the
evidence in the case.'" (18 Cal.4th at p. 569.)

Opinion at 8-10.

3)      Applicable Law

Generally, claims of error in state court jury instructions are a matter of state law and do not invoke a constitutional question. Hayes v. Woodford, 301 F.3d 1054, 1086 n. 38 (9th Cir. 2002). The fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71-73 (1991). Thus, to obtain relief based on a charge to the jury, a petitioner must establish not merely that the instruction was undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the petitioner by the Fourteenth Amendment. Cupp v. Naughten, 414 U.S. 141, 146 (1973). That is, the central inquiry is whether the instruction in question so infected the entire trial that the resulting conviction violates due process. Id. at 147.

As with a claim that a trial court erred in *giving* a particular instruction, a claim that a court erred in *omitting* an instruction requires a showing that the error so infected the entire trial that the resulting conviction violated due process. Henderson v. Kibbe, 431 U.S. 145, 154 (1977). However, in such cases, the petitioner's burden is especially heavy, as an omission is less likely to be prejudicial than an affirmative misstatement of the law. Id. at 155. Failure to give a jury instruction which might be proper as a matter of state law does not, by itself, merit federal habeas relief. Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985). Further, "[t]he necessity, extent and character of additional instructions are matters within the sound discretion of the trial court." Wilson v. United States, 422 F.2d 1303, 1304 (9th Cir. 1970).

4)      Discussion

The United States Supreme Court has specifically stated that corroboration of accomplice testimony is not constitutionally mandated. See United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."). See also United States v. Nolte, 440 F.2d 1124, 1126 (5th Cir. 1971) ("[T]he trial judge's decision whether to give the [accomplice credibility] instruction is not a matter requiring constitutional scrutiny."). Indeed,

12

the "uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or insubstantial on its face." United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir.1993); see also United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986), United States v. Fritts, 505 F.2d 168, 169 (9th Cir. 1974).  Therefore, "[i]f uncorroborated testimony is sufficient to support a conviction under the Constitution, there can be no constitutional right to instruct the jury that it must find corroboration for an accomplice's testimony."  Takacs v. Engle, 768 F.2d 122, 127 (6th Cir.1985).

The trial judge nevertheless did instruct the jury that it must find corroboration for accomplice testimony, instructing them that:

> You cannot find a defendant guilty based upon the testimony of an accomplice unless the testimony is corroborated by other evidence which tends to connect the defendant with the commission of the offense.
>
> To corroborate the testimony of an accomplice, there must be evidence of some act or fact, related to the crime which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime charged.
>
> However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crime charged or that it corroborate every fact to which the accomplice testifies.
>
> In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case.  You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime.  If there is no independent evidence which tends to connect the defendant with the commission of the crime, the testimony of the accomplice is not corroborated.
>
> If the crime - - if the crimes charged were committed by anyone, the witness, Robert Horn, was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration.
>
> To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution.  This does not mean, however, that you may arbitrarily disregard that testimony.  You should give that testimony the weight you think it deserves after examining it and with care and caution and in the light of all the evidence of this case.

1  RT at 828-30.  The trial judge thus instructed the jury to use a higher standard of review on

2  accomplice testimony than that required under clearly established federal law.

3        Petitioner has not shown that the trial court's ruling violated due process.   The

4  state court's rejection of this claim was neither contrary to, nor an unreasonable application of,

5  clearly established federal law and petitioner is not entitled to relief on this claim.

6        C.    <u>Identification Testimony</u>

7        1)    <u>Description of Claim</u>[2]

8        Darwin Brown testified that just before he was shot he "quick (sic) glanced at the

9  passenger."  RT at 138.  As a result of his wounds Darwin initially had a poor memory of the

10  shooting and was unable to speak for roughly one week.  RT at 125.  Detective Seraypheap from

11  the Stockton Police Department visited Darwin in the hospital and showed him a photographic

12  lineup of people who "may or many not" have been involved in the shooting.  <u>Id.</u> at 126.  Darwin

13  was presented with petitioner's photo and the photos of five other individuals with similar

14  features.  <u>Id.</u> at 470.  At this time Darwin's head was "bandaged up," he was possibly using a

15  machine to help him breathe, and he was not able to verbally communicate.  <u>Id.</u>  Darwin testified

16  he was not able to identify anyone from the lineup because he was "too medicated."  <u>Id.</u> at 126.

17        After Darwin's release from the hospital he saw a Crime Stoppers Newspaper

18  article about the shooting with the names and pictures of Robert Horn and petitioner identified as

19  suspects.  <u>Id.</u> at 158.  At trial Darwin testified that there was no doubt in his mind that petitioner

20  was the person who shot him.  <u>Id.</u> at 171.  Darwin testified on cross examination that he hadn't

21  been able to identify petitioner as the shooter when presented with the photo lineup, but was able

22  to do so at the preliminary hearing after seeing petitioner's name and photo in the Crime

23  Stoppers article.  <u>Id.</u> at 169.

24  /////

25

26        [2] This claim was presented to the California Supreme Court and denied without comment.

1    When David Brown was first shown the photo lineup containing petitioner's

2   photo he did not identify petitioner.  Id. at 439.  At a later date David again viewed a photo

3   lineup and identified petitioner as the shooter.  Id. at 457.  At petitioner's first trial David

4   testified petitioner was not the shooter.  Id. at 418.  At the second trial, David testified that he did

5   recognize petitioner as the shooter from the first photo lineup but did not want to identify him.

6   Id. at 438.  David also testified at the second trial that he did not identify petitioner as the shooter

7   during the first trial because he feared for his family's safety.  Id. at 418.

8    Petitioner attacks the in-court identifications of Darwin and David Brown.

9   Petitioner argues that the in-court identifications by Darwin and David Brown were "unreliable"

10   and tainted" because they were the result of the prejudicial photo identification process used by

11   the Stockton Police Department and were the result of a Crime Stoppers Newspaper article.

12   Petition at 16, 30-31.

13    2)    Applicable Law

14    The Due Process Clause of the United States Constitution prohibits the use of

15   identification procedures which are "unnecessarily suggestive and conducive to irreparable

16   mistaken identification."  Stovall v. Denno, 388 U.S. 293, 302 (1967), overruled on other

17   grounds by Griffith v. Kentucky, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules

18   propounded by Supreme Court).  A suggestive identification violates due process if it was

19   unnecessary or "gratuitous" under the circumstances.  Neil v. Biggers, 409 U.S. 188, 198 (1972).

20    See also United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step

21   process in determining the constitutionality of pretrial identification procedures: first, whether

22   the procedures used were impermissibly suggestive and, if so, whether the identification was

23   nonetheless reliable).  Each case must be considered on its own facts and whether due process

24   has been violated depends on "the totality of the circumstances' surrounding the confrontation."

25   Simmons v. United States, 390 U.S. 377, 383 (1968).  See also Stovall, 388 U.S. at 302.

26   /////

15

1          An identification procedure is suggestive where it "[i]n effect ... sa[ys] to the

2  witness 'This is the man.' " Foster v. California, 394 U.S. 440, 443 (1969).  One-on-one

3  identifications are suggestive.  See Stovall, 388 U.S. at 302.  However, "the admission of

4  evidence of a showup without more does not violate due process."  Biggers, 409 U.S. at 198.

5  One-on-one identifications are sometimes necessary because of officers' and suspects' strong

6  interest in the expeditious release of innocent persons and the reliability of identifications made

7  soon after and near a crime.  See, e.g., United States v. Kessler, 692 F.2d 584, 585 (9th

8  Cir.1982);  United States v. Coades, 549 F.2d 1303, 1305 (9th Cir.1977).

9          If the flaws in the pretrial identification procedures are not so suggestive as to

10  violate due process, "the reliability of properly admitted eyewitness identification, like the

11  credibility of the other parts of the prosecution's case is a matter for the jury."  Foster v.

12  California, 394 U.S. 440, 443 n. 2 (1969).  See also Manson v. Brathwaite, 432 U.S. 98, 116

13  (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of

14  identification testimony that has some questionable feature").  On the other hand, if an out-of-

15  court identification is inadmissible due to unconstitutionality, an in-court identification is also

16  inadmissible unless the government establishes that it is reliable by introducing "clear and

17  convincing evidence that the in-court identifications were based upon observations of the suspect

18  other than the lineup identification."  United States v. Wade, 388 U.S. 218, 240 (1967).  See also

19  United States v. Hamilton, 469 F.2d 880, 883 (9th Cir.1972) (in-court identification admissible,

20  notwithstanding inherent suggestiveness, where it was obviously reliable).

21          Factors indicating the reliability of an identification include: (1) the opportunity

22  to view the criminal at the time of the crime; (2) the witness's degree of attention (including any

23  police training); (3) the accuracy of the prior description; (4) the witness's level of certainty at

24  the confrontation; and (5) the length of time between the crime and the identification.  Manson,

25  432 U.S. at 114 (citing Biggers, 409 U.S. at 199-200)).  Additional factors to be considered in

26  making this determination are "the prior opportunity to observe the alleged criminal act, the

16

existence of any discrepancy between any pre-lineup description and the defendant's actual

description, any identification prior to lineup of another person, the identification by picture of

the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the

lapse of time between the alleged act and the lineup identification." Wade, 388 U.S. at 241.  The

"central question," however, is "whether under the 'totality of the circumstances' the

identification is reliable even though the confrontation procedure was suggestive." Biggers, 409

U.S. at 199.

> 3)    Discussion

Petitioner argues that Darwin Brown's in-court identification should not have

been allowed because, "[o]nce Darwin [saw] petitioner's photo and name in the Crime Stoppers

newspaper, there can be no doubt that petitioner's conviction in part is based on a tainted in-

court identification that is in fact the fruit of a suggestive pretrial photograph process."  Petition

at 17.

However, the force of the suggestion in a pretrial identification is not alone

determinative. U.S. v. Peele, 574 F.2d 489, 490 (9th Cir. 1978).  "What controls the case is the

likelihood of irreparable misidentification balanced against the necessity for the Government to

use the identification procedures in question." Id.; Manson v. Brathwaite, 432 U.S. 98 (1977);

Biggers, 409 U.S. 188; Simmons, 390 U.S. 377; Stovall, 388 U.S. 293.  See United States v.

Pheaster, 544 F.2d 353, 370 (9th Cir. 1976), cert. denied, 429 U.S. 1099 (1977).  In Stovall the

Court explained that a suggestive pretrial identification procedure does not violate due process

when use of the procedure is "imperative." U.S. v. Montgomery, 150 F.3d 983, 992 (9th Cir.

1998). See Stovall, 388 U.S. at 301-02 (holding that a one person show-up in a hospital room of

critically wounded victim did not violate due process where the record revealed that the

suggestive confrontation was "imperative").

During the initial investigation petitioner was identified as a possible suspect.  RT

at 469-70.  Detectives then constructed a photo lineup consisting of six pictures; petitioner's

picture and the pictures of five other individuals with similar features.  Id. at 470.  That photo

lineup was then shown to Darwin Brown, Clayton Brown and David Brown.  Id. at 471.  Clayton

Brown and David Brown identified petitioner from the photo lineup as the shooter.  Id. at 472-

75.

        After a search spanning several days the Stockton Police were unable to locate

petitioner and Detective Seraypheap contacted the Crime Stoppers Newspaper.  Id. at 476.  The

article with petitioner's name and photograph identifying him as a suspect ran on May 21,

nineteen days after the shootings.  Id.  An anonymous tip led to petitioner's arrest in Buffalo,

N.Y.  Id. at 477.

        Petitioner does not allege that there was anything "unnecessarily suggestive"

about the photo lineup the Stockton Police showed Darwin, Clayton and David Brown.  From

that photo lineup petitioner was identified as the shooter by two witnesses.  A search for

petitioner yielded nothing, perhaps because he had fled the area, and officers issued the Crime

Stoppers Newspaper article.

        It was imperative that the police locate petitioner as he was the suspected

shooter in multiple attempted murders.  The police also needed to notify the public for their

safety of petitioner's alleged crimes and the fact that he was at large.  There was nothing about

the actual pretrial identification methods used by the Stockton Police that can be described as

"unnecessarily suggestive."

        A photo lineup of petitioner and five other men with similar features was arranged

and two witnesses identified petitioner as the shooter.  Once petitioner became a legitimate

suspect but could not be located, the use of the Crime Stoppers Newspaper was imperative to

locate petitioner, ensure the public safety, and further the criminal investigation.

        With respect to David Brown, he testified on cross examination at petitioner's

second trial that when he was first shown the photo lineup containing petitioner's picture he

recognized petitioner as the shooter but refused to identify him because he did not want to be

involved.  <u>Id.</u> at 439, 441, 443.  Days later David was again shown a photo lineup containing

petitioner's picture and that time identified petitioner as the shooter.  <u>Id.</u> at 457.

David testified that after identifying petitioner he began having problems in his

neighborhood with people he had previously seen with petitioner's family.  <u>Id.</u> at 412.  People

began displaying gang signs and giving him "bad looks."  <u>Id.</u> at 413.  A rock was thrown through

the window of his apartment.  <u>Id.</u>  Finally, right before the first jury trial, a man approached

David and the following conversation occurred:

> And then he kind of got up on me and just was like, "What are you going to do when you go to court against my folks."
>
> I'm like, "What you talking about?"
>
> And he like, "What are you going to do when you go to court against my folks?  Because you do the same thing handling your business if you had to."
>
> And I was like, "Man, I don't know what you are talking about.  I ain't tripping off your peoples."
>
> Q.  And then what happened next - -
>
> A.  Then - -
>
> Q.  - - with that incident?
>
> A.  With that incident, before he walked off, he was just like, "Well, I want to let you know that I'm a rider and I take care of mine."
>
> I told him, "Well, you know, I'll take care of mine too, you know," but I said it in a way I didn't want to have some conflict with him.

/////

<u>Id.</u> at 415.

Afterward David approached the District Attorney's Office for help.  <u>Id.</u> at 416.

David received first and last months rent on an apartment in a different part of Stockton.  <u>Id.</u> at

417.  However, David still did not feel safe after the move because he saw people from his old

neighborhood in his new neighborhood.  <u>Id.</u> at 417-18.  As a result David would not identify

petitioner at the first trial.  <u>Id.</u> at 417.

1        Detective Seraypheap spoke with David after the first trial and David told him

2   that he still did not feel safe identifying petitioner as the shooter in-court.  Id. at 419.  It was

3   agreed that David would be safer if he were moved to a different town.  Id.  At petitioner's

4   second trial, and after he was moved to a new town, David identified petitioner as the shooter.

5   Id. at 409.

6        Petitioner argues that the "suggestiveness" of the Crime Stoppers article caused

7   David to identify petitioner the shooter.  Petition at 30.  David's testimony at the second trial

8   however did not indicate that he had viewed the Crime Stoppers article.[3]

9        Regardless, as previously stated, the Stockton Police did not use an unnecessarily

10  suggestive method to identify petitioner and the use of the Crime Stoppers article was imperative

11  for public safety reasons.

12        In the alternative, petitioner argues that David's identification was unreliable

13  because he was "persuaded by Detective Seraypheap and the prosecutor . . . to 'finger' petitioner

14  as the passenger as a quid pro quo for a place to live, outside of Stockton . . ."  Petition at 29.

15  Assuming, arguendo, that is true, those facts have nothing to do with the pretrial photo

16  identification methods used by the Stockton Police.  They were a matter of credibility for

17  argument to the jury.

18        The in-court identifications of petitioner by Darwin and David Brown were not

19  the result of unnecessarily suggestive identification procedures.  The reliability of their

20  identifications was therefore a matter for the jury.  Foster, 394 U.S. at 443 n. 2.  The state court's

21  rejection of this claim was neither contrary to, nor an unreasonable application of, clearly

22  established federal law and petitioner is not entitled to relief on this claim.

23  /////

24

---

25        [3] Petitioner claims David testified at the first trial that "the only thing I knew was what I
26  was already hearing and stuff that the newspaper was telling me as far as the shooter."  Petition
    at 30.

1    D.    Ineffective Assistance of Counsel

2        1)    Description of Claim[4]

3        Petitioner argues that his trial counsel was ineffective for failing to move to

4    suppress the in-court identifications of Darwin and David Brown.  Petition at 36.  Petitioner also

5    argues that his appellate counsel was ineffective for failing to challenge on appeal the pretrial

6    identifications and for failing to claim ineffective assistance of trial counsel.  Id. at 45.

7        2)    Applicable Law

8        The Sixth Amendment guarantees the effective assistance of counsel.  The United

9    States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

10    Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

11    counsel, a petitioner must first show that, considering all the circumstances, counsel's

12    performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 687-88.

13    After a petitioner identifies the acts or omissions that are alleged not to have been the result of

14    reasonable professional judgment, the court must determine whether, in light of all the

15    circumstances, the identified acts or omissions were outside the wide range of professionally

16    competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).

17        Review of counsel's performance is "highly deferential" and there is a "strong

18    presumption" that counsel rendered adequate assistance and exercised reasonable professional

19    judgment.  Williams v. Woodford, 384 F.3d 567, 610 (9th Cir.2004), cert. denied, 546 U.S. 934

20    (2005) (quoting Strickland, 466 U.S. at 689).  Courts judge the reasonableness of an attorney's

21    conduct "on the facts of the particular case, viewed as of the time of counsel's conduct."

22    Strickland, 466 U.S. at 690.  The court may "neither second-guess counsel's decisions, nor apply

23    the fabled twenty-twenty vision of hindsight."  Karis v. Calderon, 283 F.3d 1117, 1130 (9th Cir.

24    2002), cert. denied, 539 U.S. 958 (2003) (citation and quotations omitted); see Yarborough v.

25

26    _____

[4] This claim was presented to the California Supreme Court and denied without comment.

21

1   Gentry, 540 U.S. 1, 8 (2003) ("The Sixth Amendment guarantees reasonable competence, not

2   perfect advocacy judged with the benefit of hindsight.") (citations omitted); Morris v. California,

3   966 F.2d 448, 456-57 (9th Cir.) (if court can conceive of reasonable tactical purpose for

4   counsel's action or inaction, court need not determine actual explanation), cert. denied, 506 U.S.

5   831 (1992).  A habeas petitioner bears the burden to overcome the presumption that, under the

6   circumstances, the challenged action constituted competent representation.  Strickland, 466 U.S.

7   at 689.  "In short, the defendant must surmount the presumption that, under the circumstances,

8   the challenged action might be considered sound trial strategy." United States v. Quintero-

9   Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995) (citation and internal quotations omitted), cert.

10   denied, 519 U.S. 848 (1996).

11          Second, a petitioner must establish that he was prejudiced by counsel's deficient

12   performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

13   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

14   been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

15   confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

16   F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

17   performance was deficient before examining the prejudice suffered by the defendant as a result

18   of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground

19   lack of sufficient prejudice ... that course should be followed." Pizzuto v. Arave, 280 F.3d 949,

20   955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

21          The Strickland standards apply to appellate counsel as well as trial counsel.

22   Smith v. Murray, 477 U.S. 527, 535-36 (1986);  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.

23   1989).  However, an indigent defendant "does not have a constitutional right to compel

24   appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

25   professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

26   (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the

1   ability of counsel to present the client's case in accord with counsel's professional evaluation

2   would be "seriously undermined." Id. See also Smith v. Stewart, 140 F.3d 1263, 1274 n. 4 (9th

3   Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

4   not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

5   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

6   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

7   to raise a weak issue. See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

8   context, petitioner must show that, but for appellate counsel's errors, he probably would have

9   prevailed on appeal. Id. at 1434 n. 9.

10              3)    Discussion

11              An attorney's failure to make a meritless objection or motion does not constitute

12   ineffective assistance of counsel.  Jones v. Smith, 231 F.3d 1227, 1239 n. 8 (9th Cir. 2000)

13   (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir.1985)).  See also Rupe v. Wood, 93 F.3d

14   1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient

15   performance").  "To show prejudice under Strickland resulting from the failure to file a motion, a

16   defendant must show that (1) had his counsel filed the motion, it is reasonable that the trial court

17   would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that

18   there would have been an outcome more favorable to him." Wilson v. Henry, 185 F.3d 986, 990

19   (9th Cir.1999) (citing Kimmelman, 477 U.S. at 373-74) (so stating with respect to failure to file a

20   motion to suppress on Fourth Amendment grounds)). See also Van Tran v. Lindsey, 212 F.3d

21   1143, 1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's failure to pursue a

22   motion to suppress a lineup identification), overruled on other grounds by Lockyer v. Andrade,

23   538 U.S. 63 (2003).

24              Petitioner argues that if his trial counsel had made a motion to suppress the in-

25   court identifications that "in light of the fact that the identifications were inadmissible hearsay,

26   such an effort would have been successful." Petition at 39.  The identifications were not hearsay

1    and it is not apparent that any motion to suppress them would have been meritorious.

2    Petitioner's counsel vigorously cross-examined Darwin regarding the possible

3    influence of the crime stoppers newspaper article and his previous inability or unwillingness to

4    identify petitioner, as well as David, due to his repeated contradictions.  Nevertheless, the

5    pretrial  identifications of Darwin and David Brown were not the result of unnecessarily

6    suggestive identification procedures.  It is highly unlikely that a motion to suppress the in-court

7    identifications would have been successful.

8    Further, even if the court had suppressed those identifications petitioner cannot

9    show that it is reasonable that there would have been an outcome more favorable to him.  Darwin

10   and David were just two of four witnesses who identified petitioner as the shooter.  Robert Horn

11   and Clayton Brown also identified petitioner as the shooter.

12   Robert Horn testified that he first encountered petitioner on the date of the

13   shooting at the hospital, when petitioner asked him to give petitioner a ride back to the location

14   of the shooting to retrieve his brother's phone.  RT at 191.  Robert testified that as he approached

15   the scene of the crime petitioner began firing a handgun.  Id. at 194.  While petitioner may

16   discount the impact of Robert Horn's testimony on the jury because he was an accomplice

17   petitioner does not challenge Clayton Brown's testimony.

18   Clayton Brown testified that on the night of the shooting he watched the suspect

19   vehicle "the whole time" and that "Vernon Shaw" was the shooter.  Id. at 279-80.  Clayton

20   further testified that Robert Horn was the driver, that he had never seen petitioner prior to the

21   shooting, and that when Detective Seraypheap first showed Clayton the photo lineup he had not

22   seen any Crime Stoppers article.  Id. at 280-88.

23   Even if petitioner's counsel could have convinced the court to suppress the in-

24   court identifications of Darwin and David Brown, and then convinced the jury to discount

25   Robert Horn's testimony, which is not at all likely, the jury would still have been presented with

26   Clayton Brown's eyewitness testimony identifying petitioner as the shooter.  Petitioner has not

1  shown that had a motion to suppress Darwin and David's in-court identifications been granted,

2  there is a reasonable probability that the outcome would have been more favorable to him.

3  Because petitioner's claim that his trial counsel was ineffective for failing to

4  suppress the in-court identifications is without merit, it therefore follows that his appellate

5  counsel was not ineffective for failing to raise that issue or an ineffective assistance of trial

6  counsel claim based on that issue on appeal.  See Strickland, 466 U.S. at 687-88 (requiring a

7  showing of deficient performance as well as prejudice).

8  Petitioner has not shown that his trial counsel or appellate counsel were

9  ineffective.  The state court's rejection of this claim was neither contrary to, nor an unreasonable

10  application of, clearly established federal law and petitioner is not entitled to relief on this claim.

11  VI.    CONCLUSION

12  Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of

13  habeas corpus be denied.

14  These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

16  days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within ten days after service of the objections.  The parties are advised

20  that failure to file objections within the specified time may waive the right to appeal the District

21  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: August 21, 2009

23  _____
    CHARLENE H. SORRENTINO
24  UNITED STATES MAGISTRATE JUDGE

25

26